[No. A049987. First Dist., Div. Two. Feb. 28, 1991.]

ROBERT E. WOOLLEY et al., Plaintiffs and Appellants, v.
EMBASSY SUITES, INC., et al., Defendants and Respondents.

**COUNSEL**

Morrison & Foerster, James J. Brosnahan, Andrew E. Monach, Jeffrey Nussbaum, Ruth N. Borenstein, Bickel & Brewer and John W. Bickel II for Plaintiffs and Appellants.

McCutchen, Doyle, Brown & Enersen, Richard Murray, Gregory P. Landis, Leslie G. Landau, John C. Morrissey, Debra L. Fischer, Alston & Bird and Ronald L. Reid for Defendants and Respondents.

## OPINION

**SMITH, J.**—This is an appeal from an order granting a preliminary injunction, the effect of which is to prevent the owners of nine hotels managed by Embassy Suites, Inc. (Embassy) from terminating Embassy's management contracts pending the resolution of an arbitration to determine whether Embassy breached the contracts. Because the injunction violated several principles governing the issuance of such equitable relief, we will reverse.

### BACKGROUND

Plaintiffs Robert Woolley and Charles Sweeney are managing general partners of 22 partnerships which own 22 hotels throughout the nation. All the hotels are franchised by Embassy and 17 of the 22 hotels are also managed by Embassy pursuant to 17 individual management agreements. Most of these management contracts were acquired in 1986 from Landmark Hotels, Inc.

The contracts provide that the owner shall have the right to terminate the manager upon service of written notice of breach of contract setting forth the details of the breach and the failure of the manager to cure the breach within 60 days following such notice. The agreements also permit the manager to demand arbitration within 15 days of the notice of breach, upon which the dispute shall be submitted promptly to binding arbitration.

In December of 1989 the Woolley/Sweeney partnerships served Embassy with notices of default on nine of the hotels, alleging that Embassy had materially breached the management agreements by making expenditures in excess of budget allocations. On January 18, 1990 (all further calendar references are to that year), they filed the present suit against Embassy and its parent Holiday Corporation for damages, rescission, declaratory relief and an accounting. Plaintiffs alleged breach of contract, negligence, fraud and other wrongdoing, and sought substantial damages as well as a judicial declaration that the management contracts[1] could be terminated.

Embassy responded by filing five separate actions in Dallas, Texas, seeking declaratory and injunctive relief and demanding arbitration of the

---

[1] So far as appears, there is no dispute regarding the Embassy franchise agreements.

claims made by plaintiffs in the California action. On February 6, Embassy moved the Texas court to compel arbitration and successfully obtained a stay from the superior court in California pending the outcome of the arbitration issue in Texas. The parties eventually entered into a consent order in Texas under which the "cure period" for plaintiffs' notices of default would begin to run on May 2, and plaintiffs would abstain from terminating the management contracts until at least June 1. On May 11, the Texas court adopted in full the findings of a special master that the disputes with respect to the nine hotels in question were subject to arbitration.[2]

On May 22, Embassy filed an application for a temporary restraining order and obtained an order to show cause why a preliminary injunction should not issue barring plaintiffs from terminating the management contracts pending the outcome of the arbitration. After considering the declarations and extensive briefing the court below found that plaintiffs' threatened termination of the nine contracts "would be likely to render the arbitrations ineffectual and to cause irreparable harm to [Embassy]" and issued a preliminary injunction enjoining plaintiffs from terminating or attempting to terminate any of the management agreements. The injunction was made effective upon Embassy's posting of a $4,350,000 bond.

APPEAL

I

*The Effect of Code of Civil Procedure Section 1281.8 on the Requirements for Injunctive Relief*

■ Embassy asserts that plaintiffs' threatened termination of the management contracts is an attempt to circumvent their promise to arbitrate and that the trial court's injunction was necessary to preserve the status quo and prevent the arbitrator's award from becoming moot. It relies on Code of Civil Procedure section 1281.8 (all unspecified statutory references are to that code), which was enacted in 1989 and provides, in pertinent part: "(b) A party to an arbitration agreement may file . . . an application for a provisional remedy in connection with an arbitrable controversy, *but only upon the ground that the award to which the applicant may be entitled may be rendered ineffectual without provisional relief.*" (Italics added.)

It is Embassy's position that the italicized language means that a trial court passing on the propriety of issuing an injunction pending arbitration

---

[2] The disputes which the Texas court found to be subject to arbitration relate to the following nine Embassy franchises: Anaheim, Miami, Milpitas, Napa, Fort Lauderdale South, Tampa Busch, Los Angeles, St. Paul, and Santa Ana.

need determine only the single issue of whether the arbitration award might be rendered ineffectual without injunctive relief, and that the other traditional requirements for obtaining a preliminary injunction (e.g., probability of success on the merits, irreparable injury, inadequacy of a remedy at law) do not apply. Although no California appellate court has yet addressed this issue, we are convinced Embassy's interpretation is misguided.

Section 1281.8 was enacted primarily to allow a party to an arbitration to obtain provisional judicial remedies without waiving the right to arbitrate, as some early cases had suggested. (Legis. Counsel's Dig., Sen. Bill No. 1394, Stats. 1989, ch. 470, § 2 [No. 4 Deering's Adv. Legis. Services, p. 1482; No. 6 West's Cal. Legis. Service, p. 1518]; Sen. Com. on Judiciary Rep. (hereafter Committee report), May 17, 1989, pp. 1-2.) The statute covers not merely injunctions, but all provisional remedies, including attachments, temporary protective orders, writs of possession and appointment of receivers. (§ 1281.8, subds. (a)(1)-(4).) The logical reason for the requirement that an applicant be required to show that an arbitration award may be rendered ineffectual is to ensure that the court does not invade the province of the arbitrator—i.e., the court should be empowered to grant provisional relief in an arbitrable controversy only where the arbitrator's award may not be adequate to make the aggrieved party whole. However, there is nothing in the statute's history which indicates that the provision was intended to supplant the general statutes applicable to injunctions or decisional law criteria governing them.

█ It is a settled precept of statutory construction that a special statute will not be construed to effect a repeal of a more general statute unless the two are irreconcilable and in direct conflict with each other. (*Van de Kamp v. Bank of America* (1988) 204 Cal.App.3d 819, 838 [251 Cal.Rptr. 530].) There is a presumption against repeal by implication, especially where settled law has been generally understood and acted upon. (*Metropolitan Water Dist.* v. *Dorff* (1982) 138 Cal.App.3d 388, 396-397 [188 Cal.Rptr. 169].) A special act will not be considered an exception to the general statute unless the two acts are so inconsistent that there is no possibility of concurrent operation, or where the later act gives undebatable evidence of an intent to supersede the earlier. (*Fillmore* v. *Irvine* (1983) 146 Cal.App.3d 649, 657 [194 Cal.Rptr. 319]; *State Compensation Ins. Fund* v. *Workers' Comp. Appeals Bd.* (1979) 88 Cal.App.3d 43, 58 [152 Cal.Rptr. 153].)

█ Embassy offers no such "undebatable" evidence overcoming this presumption. Instead, it points to a sentence in the Committee report indicating that section 1281.8 was modeled after a similar New York statute (N.Y. Civ. Prac. L. & R. § 7502(c)), and exhorts us to follow New York cases which hold that this statute renders "inapplicable" the grounds for

relief elsewhere set forth in that state's more general statutes. (*Suffolk County Patrolmen's Benevolent Association, Inc. et al.* v. *County of Suffolk* (1989) 150 A.D.2d 361 [540 N.Y.S.2d 882, 883]; *Drexel Burnham Lambert* v. *Ruebsamen* (1988) 139 A.D.2d 323 [531 N.Y.S.2d 547, 550].) The cited decisions are not convincing, however, in that they apparently ignore that portion of New York Civil Practice Law and Rules section 7502 *incorporating* the more general statutes.[3] Moreover, other New York cases either implicitly or explicitly hold that the traditional requirements for obtaining provisional relief still apply. (*Saferstein* v. *Wendy* (1987) 137 Misc.2d 1032 [523 N.Y.S.2d 725, 727]; *Miller* v. *Macri* (1987) 132 A.D.2d 691 [518 N.Y.S.2d 170, 172].) New York's highest court has yet to resolve the apparent conflict.

Regardless of the controversy in New York, however, there is strong evidence that the Legislature in *this* state did not intend to sweep aside application of traditional principles of equity in enacting section 1281.8.

First, "provisional remedy" is defined in section 1281.8 to include "[p]reliminary injunctions and temporary restraining orders issued *pursuant to Section 527.*" (§ 1281.8, subd. (a)(3), italics added.) Section 527, subdivision (a) permits an injunction to be issued upon a satisfactory showing "that sufficient grounds exist therefor." Permissible and impermissible grounds for injunctive relief are found in section 526. By thus referring back to section 527, section 1281.8 incorporates the more general provisions governing injunctions found elsewhere in the Code of Civil Procedure.

Second, the Committee report on section 1281.8 states plainly that "[t]he *other requirements for obtaining the provisional remedy would still apply.*" (Committee rep., p. 2., com. 2 (c), italics added.) A clearer manifestation of an intent to preserve generally applicable rules of equity within the statute could hardly be found.

Embassy rejoins that the quoted sentence must have been intended to denote only *procedural* requirements. We doubt that. Had the Committee meant to limit its incorporation of "requirements" strictly to matters of procedure, it could have easily said so. ■ Also, statutes must be given a common sense construction rather than one which leads to absurdity.

---

[3] New York Civil Practice Law and Rules section 7502(c) provides: that a trial court in the county where an arbitration is pending "may entertain an application for an order of attachment or for a preliminary injunction in connection with an arbitrable controversy, but only upon the ground that the award to which the applicant may be entitled may be rendered ineffectual without such provisional relief. *The provisions of articles 62 and 63 of this chapter shall apply to the application . . . .*" (N.Y. Civ. Prac. L. & R. § 7502(c).) Chapter 62 deals with the requirements for preliminary injunctions and restraining orders, while chapter 63 deals with attachments.

(*Zurmati* v. *McMahon* (1986) 180 Cal.App.3d 164, 176 [225 Cal.Rptr. 374]; *DeYoung* v. *City of San Diego* (1983) 147 Cal.App.3d 11, 18 [194 Cal.Rptr. 722].) ■ If section 1281.8 eliminated all of the "substantive" requirements for obtaining a preliminary injunction save that the arbitrator's award might be rendered ineffectual, injunctions could conceivably issue staying proceedings in federal court, preventing the execution of a valid statute for the public benefit, or preventing a municipal body from enacting legislation, all of which are prohibited by section 526.[4] It is highly unlikely that the Legislature would have intended such nonsensical results, or that the enactment of section 1281.8 should confer upon parties to an arbitrable controversy some special status, free from the burden imposed upon other litigants of the evidentiary showing required for obtaining provisional relief.

For the above reasons, we conclude that the possibility that an arbitration award might be rendered ineffectual is a threshold or minimum requirement for obtaining a preliminary injunction under section 1281.8. It does not preempt section 526 or relieve an applicant from the burden of showing that the common law requirements for injunctive relief have been satisfied. Accordingly, we review the order below according to accepted statutory and common law principles.

## II

### Principal's Power to Revoke Agent's Authority

The effect of the injunction at issue is to compel plaintiffs to continue to employ Embassy as manager of the nine hotels in question. ■ It is a cardinal principle of agency law that a principal who employs an agent always retains the power to revoke the agency. " 'Save in the case of an agency coupled with an interest, a principal has the *power* to revoke an agent's authority at any time before the agent has completed performance.' " (*Elevator Operators etc. Union* v. *Newman* (1947) 30 Cal.2d 799, 807 [186 P.2d 1], italics original, citing *Parke* v. *Frank* (1888) 75 Cal. 364, 367-368 [17 P. 427]; see Civ. Code, § 2356; 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 208, p. 206; Reuschlein & Gregory, Agency and Partnership (West 1978) § 43, p. 84 (Reuschlein).) Because an agency depends upon the mutual assent of the parties, it may be

---

[4] Likewise, since section 1281.8 applies to *all* provisional remedies, by Embassy's reasoning attachments could issue without plaintiff establishing the probable validity of its claim (§§ 484.090, subd. (a)(2), 481.190), writs of possession could issue without a showing that plaintiff is contractually entitled to possession of the property (§ 512.010 subd. (b)) and receivers could be appointed in cases not otherwise specifically authorized by statute. (See 6 Witkin, Cal. Procedure (3d ed. 1985), Provisional Remedies, § 340, p. 288; § 91, p. 90; § 219, pp. 195-196.)

renounced by either the principal or the agent at any time. (*Preszler* v. *Dudley* (1957) 153 Cal.App.2d 120, 123 [314 P.2d 138]; Reuschlein, *supra*, § 42, p. 84.) Although the termination cannot be prevented by the agent, the agent's remedy for wrongful termination is damages, as in any other breach of contract action. (*Elevator Operators etc. Union* v. *Newman, supra*, 30 Cal.2d at p. 807.)

■■■■ The injunctive order below runs afoul of these principles by barring plaintiff hotel owners from terminating the services of their managers and ordering the agency relationship to continue against the owners' wishes. Embassy asserts that the injunction was proper because the court simply enforced plaintiffs' written promise that they would not terminate the management contract unless the arbitrator first found in their favor on the issue of breach. According to Embassy, the contract makes plaintiffs' right to terminate "subject to" the right of Embassy to require arbitration over whether the alleged breach justifies termination. If the trial court's "stayed termination amounts to an 'intolerable' 'death grip,' " Embassy declares, "it is one that plaintiffs freely agreed to." This argument is based on a misreading of the management contract.

Section 8.1 of the contract defines a permissible "terminating event" as the giving of notice by the owners of a material breach by the manager and the failure to cure such breach within 60 days (unless the breach is of such nature that cure within that time is impossible). Subparagraph (j) provides that in the event a notice of breach is given, the manager has the option of demanding arbitration on the issue, that "the dispute shall be submitted promptly to arbitration," and that "such determination shall be binding upon both parties." Subparagraph (i) confers an equal right upon the owner to demand arbitration in the event the manager declares a breach. Nowhere does the contract limit the ability of the manager to sever the relationship, or condition it on a successful outcome of the arbitration. Of course, by relieving Embassy of its duties before arbitration, the owner risks exposure to a substantial damage award for wrongful termination in the event Embassy ultimately prevails. However, nothing in the contract implicitly or expressly abrogates the unqualified common law right of either party to terminate the agency.

Even if the contract did attempt to restrict the power of the owner to terminate the manager, such provision would be ineffective. The principal's power of revocation is absolute and applies even if doing so is a violation of the contract or the agency is characterized as "irrevocable." (Rest.2d Agency, § 118, com. b., p. 300; Seavey, Handbook of the Law of Agency (West 1964) § 46, p. 87 (Seavey).) "It is believed that it should always be within the power of the principal to manage his own business and that includes the

power of the principal to reassume the control over his own business which he has but delegated to his agent." (Reuschlein, *supra*, § 47, p. 96.)

In an attempt to overcome these established rules of agency, Embassy postulates that the relationship between itself and plaintiffs is not a "true" agency. ■ "An agent 'is anyone who undertakes to transact some business, *or manage some affair*, for another, by authority of and on account of the latter, and to render an account of such transactions.' [Citation.] 'The chief characteristic of the agency is that of representation, the authority to act for and in the place of the principal for the purpose of bringing him or her into legal relations with third parties. [Citations.]'" (*McCollum* v. *Friendly Hills Travel Center* (1985) 172 Cal.App.3d 83, 91 [217 Cal.Rptr. 919] (*McCollum*), italics added.) ■ The management contracts themselves eloquently confirm that the relationship is one of agency: An early recital states that, "Owner hereby employs [the manager] . . . *as the exclusive agent* of Owner to direct, supervise and manage the operation of [the hotel]." Section 13.13 provides: "Nothing contained in this Agreement shall constitute or be construed to be or create a partnership or joint venture between Owner and [manager], nor a lease of [hotel] . . . assets. *The sole relationship between Owner and [manager] is that of principal and agent.*" (Italics added.)

Embassy claims that we can ignore these contractual designations as mere "labels" and that the relationship between itself and the owners "defies simple principal-agent classification," because plaintiffs entrusted to them the "entire operation" of their hotels. However the very nature of a managerial relation is to delegate authority from principal to agent. "A manager normally has the widest authority of all business agents and, unless limited by instructions, is in complete control of its operations." (Seavey, *supra*, § 26, p. 48; Cf. *Sklar* v. *Princess Properties International, Ltd.* (1987) 194 Cal.App.3d 1202, 1205-1206 [240 Cal.Rptr. 102] [agreement to provide hotel corporation with " 'sales and marketing, reservation, and administrative support services' " deemed to create agency relationship].) ■ Embassy correctly observes that one essential of the principal-agent relationship is the right of control. However, it is not necessary that this control be exercised or even that there be actual supervision of the agent's activities; the existence of the *right* establishes the relationship. (*McCollum, supra,* 172 Cal.App.3d at p. 91; *Stevens* v. *Roman Catholic Bishop of Fresno* (1975) 49 Cal.App.3d 877, 884 [123 Cal.Rptr. 171]; see also Rest.2d Agency, § 1, com. (a), p. 8.) ■ In the management contracts at bar the owner retains the right of control in important respects— for example, the manager must submit a proposed operating budget for the fiscal year to the owner for approval and furnish detailed monthly financial information; it must receive the owner's approval in hiring legal counsel; it

may not engage any employee for a period of longer than a year without the owner's consent; and no collective bargaining agreement or labor contract is valid without the owner's signature.

 As a final gambit, Embassy argues that if the contract is one of agency, it is an agency coupled with an interest, which is not subject to revocation. (See *O'Connell* v. *Superior Court* (1935) 2 Cal.2d 418, 422 [41 P.2d 334, 97 A.L.R. 918]; *Jay* v. *Dollarhide* (1970) 3 Cal.App.3d 1001, 1022-1023 [84 Cal.Rptr. 538].) This thesis fails as well.

For an agency to be coupled with an interest the agent must have a "specific, present and coexisting" beneficial interest in the subject matter of the agency. (*Jay* v. *Dollarhide, supra,* 3 Cal.App.3d at p. 1023, quoting *O'Connell* v. *Superior Court, supra,* 2 Cal.2d at p. 422.) The agency must be created for the *benefit of the agent* in order to protect some title or right in the subject of the agency or secure some performance to him. (*Becket* v. *Welton Becket & Associates* (1974) 39 Cal.App.3d 815, 820 [114 Cal.Rptr. 531].) Here, the sole interest of Embassy in the management contract is a "management fee" of 5 percent of the gross revenue from the hotel. Monetary compensation, in whatever form it may take, does not create a power coupled with an interest so as to make the agency irrevocable. (2 Witkin, *op. cit. supra,* § 209, p. 207; *O'Connell* v. *Superior Court, supra,* 2 Cal.2d at pp. 423-424.)

*Capital Nat. Bk. of Sacramento* v. *Stoll* (1934) 220 Cal. 260 [30 P.2d 411] is illustrative. Plaintiff entered into a contract with his father to manage several of his properties, including three hotels, thirteen stores and three ranches. In addition to paying plaintiff a monthly salary, the father agreed not to take any action to reduce his son's share of the estate to which he was entitled as an heir at law. Upon the father's incapacity, his appointed guardian declared the contract terminated and obtained an injunction restraining the son from interfering with the management of the properties. Plaintiff argued that because of his contractual interest in the father's estate, the agency was coupled with an interest and therefore irrevocable. In rejecting this claim, the California Supreme Court stated that "where no specific [] present property interest has been found, the courts have consistently held the agency revocable . . . in spite of express declarations in the contract that it was coupled with an interest and irrevocable. [Citations.]" (*Id.,* at p. 265.) Since no present property interest passed to plaintiff on the creation of the agency, the court held that the agreement "[did] not fall within the rare class of irrevocable agencies, and that the judgment of the court below, in so far as it terminates the *agency,* is correct." (*Id.,* at p. 266, italics original.) Similarly, the lack of any *present property* interest in the hotels it manages is fatal to Embassy's claim of irrevocability.

Embassy says that this agency is different because the hotels are franchised with the Embassy name and that it therefore has its own interest in their success. But the franchise agreements are severable and independent from the management contracts, as evidenced by the fact that some of plaintiffs' Embassy hotels are managed by others. Embassy's "proprietary interest" claim is further weakened by the fact that it did not contract in the first instance with plaintiffs, but acquired the management contracts by way of assignment. In sum, the "interest" Embassy has in seeing the hotels succeed so as to enhance its reputation and prestige is not the type of specific, coexisting property interest necessary to constitute an agency coupled with an interest. Because plaintiffs retained the unfettered right to revoke the agency, the injunction restraining them from doing so was error.

## III

### Enforcement of Personal Service Contracts

■ We perceive a second fundamental flaw in the order granting the preliminary injunction. An injunction cannot be granted to prevent the breach of a contract which cannot be specifically enforced. (§ 526, subd. (5); Civ. Code, § 3423, subd. Fifth; *Thayer Plymouth Center, Inc.* v. *Chrysler Motors Corp.* (1967) 255 Cal.App.2d 300, 304 [63 Cal.Rptr. 148] (*Thayer Plymouth*); *Adams* v. *Williams Resorts, Inc.* (1962) 210 Cal.App.2d 456, 463 [26 Cal.Rptr. 656].) And it is a fundamental rule that specific performance cannot be decreed to enforce a contract for personal services, regardless of which party seeks enforcement. (Civ. Code, § 3390, subds. (1) & (2); *Barndt* v. *County of Los Angeles* (1989) 211 Cal.App.3d 397, 403 [259 Cal.Rptr. 372] (*Barndt*); *Motown Record Corp.* v. *Brockert* (1984) 160 Cal.App.3d 123, 129 [207 Cal.Rptr. 574].)

■ There are a variety of reasons why courts are loathe to order specific performance of personal services contracts. Such an order would impose upon the court the prodigious if not impossible task of passing judgment on the quality of performance. (*Barndt, supra*, 211 Cal.App.3d at p. 403; *Motown Record Corp.* v. *Brockert, supra*, 160 Cal.App.3d 123, 137.) It would also run contrary to the Thirteenth Amendment's prohibition against involuntary servitude. (*Beverly Glen Music, Inc.* v. *Warner Communications, Inc.* (1986) 178 Cal.App.3d 1142, 1144 [224 Cal.Rptr. 260].) Courts wish to avoid the friction and social costs which result when the parties are reunited in a relationship that has already failed, especially where the services involve mutual confidence and the exercise of discretionary authority. (*Poultry Producers etc.* v. *Barlow* (1922) 189 Cal. 278, 288-289 [208 P. 93].) Finally, it is impractical to require judicial oversight of a

contract which calls for special knowledge, skill, or ability. (*Barndt, supra,* 211 Cal.App.3d at p. 404.)

 The rule against specific performance applies not only to "nearly all contracts of continuous employment between a master and servant" but also to "contracts for the rendition of a performance that is of a distinctly personal and non-delegable character . . . . Included within this category are the contracts of actors and artists, *managers*, sales agents, school-teachers, mechanics, cooks, and contracts for the furnishing of personal care and support." (5A Corbin, Contracts (1964) § 1204, p. 398, italics added.)

The rule is statutory (Civ. Code, § 3390) and California cases applying it to a variety of comparable fact situations are numerous. (*Barndt, supra,* 211 Cal.App.3d 397 [staff physician at county hospital]; *Beverly Glen Music, Inc.* v. *Warner Communications, Inc., supra,* 178 Cal.App.3d 1142 [recording contract]; *Rautenberg* v. *Westland* (1964) 227 Cal.App.2d 566 [38 Cal.Rptr. 797] [managerial services for a corporation]; *Long Beach Drug Co.* v. *United Drug Co.* (1939) 13 Cal.2d 158 [88 P.2d 698] [exclusive sales agency]; *Poultry Producers etc.* v. *Barlow, supra,* 189 Cal. 278 [contract to resell eggs at best price under market conditions].)

 The management contracts here undisputedly call for the rendition of services which require the exercise of special skill and judgment. These managerial services, even by Embassy's own assessment, are wide ranging and involve daily discretionary activities. The manager's duties include: hiring and firing managerial personnel and hundreds of other employees, contracting for utility services, landscaping, maintenance and security, processing reservations, arranging for advertising and promotion, and filing legal actions on the owner's behalf to collect rent charges, cancel leases or dispossess guests. In other words, the contracts call for a series of complex and delicate business decisions and require mutual cooperation and trust, both of which have ceased to exist in the wake of rancorous litigation between the parties. (*Barndt, supra,* 211 Cal.App.3d at pp. 404-405; *Thayer Plymouth, supra,* 255 Cal.App.2d 300, 304; *Rautenberg* v. *Westland, supra,* 227 Cal.App.2d 566, 572.)

In support of the order below, Embassy cites that portion of Witkin which states that the rule denying specific performance of contracts "which call for a series of acts requiring continuous supervision, such as agreements for construction and repair" is "archaic" and that the "better modern cases reject this doctrine and give specific performance whenever it is practically feasible. [Citations.]" (11 Witkin, *op. cit. supra,* Equity, § 55, p. 733.) Embassy also refers us to *Okun* v. *Morton* (1988) 203 Cal.App.3d 805 [250 Cal.Rptr. 220], which upheld specific performance of a promise to pay

capital and expenses in a joint business venture. Neither *Okun* nor Witkin aids Embassy here.

First, we do not predicate today's decision on the "continuous acts" doctrine criticized by Witkin. Rather our judgment is based on the statutory and deep-rooted prohibition against compelling the performance of personal service contracts, which even Witkin accepts without question. (11 Witkin *op. cit., supra,* § 59, p. 736.) In *Okun,* too, the court saw no need to reexamine the "continuous acts" rule, noting that its application had been limited mainly to construction and sales agency agreements, neither of which were at issue. (203 Cal.App.3d, at p. 820-821.) Significantly however, the *Okun* court cautioned that "[w]e are *not here concerned with the day-to-day management of any particular Hard Rock Cafe or related enterprises that would require the close and ongoing cooperation of the parties or the court.*" (*Id.,* at p. 821, italics added.) Unlike *Okun,* the management contracts at issue here do involve "day to day" discretionary decisionmaking, as well as mutual confidence and a degree of close cooperation between the parties. Under the above-cited authority, performance of such contracts cannot be judicially compelled.

## IV

### *Adequacy of Remedy at Law*

We lastly observe that Embassy failed to show that a damage award will not provide it with an adequate remedy in the event it prevails in arbitration. A basic rule governing equitable relief is that specific performance will not be granted when a damage award would afford the plaintiff adequate relief. (11 Witkin, *op. cit. supra,* Equity, § 21, p. 698.) "In lieu of specific performance, the remedy for breach of a personal service contract is an action for damages. The loss of employment is not generally considered a loss that is inherently immeasurable or noncompensable in monetary terms." (*Barndt, supra,* 211 Cal.App.3d at p. 404.) The mere fact that the precise amount of damages may be difficult to prove does not provide the basis for injunctive relief. (*Voorhies* v. *Greene* (1983) 139 Cal.App.3d 989, 997 [189 Cal.Rptr. 132].)

A calculation of Embassy's monetary loss in the event of wrongful termination was not shown to be incapable of ascertainment. On the contrary, the fee percentage is spelled out in the contracts, each contract has a specified number of remaining years and Embassy has a track record on each of the hotels it has managed. While the loss to Embassy's reputation as a result of its wrongful termination might be difficult to measure, the subject could be adequately addressed through expert testimony. In other words, compu-

tation of a damage award would be no more difficult than any other breach of contract case where loss of profits is at issue. (See *Thayer Plymouth, supra,* 255 Cal.App.2d 300, 307.)

We also note the declaration of executive vice-president Perry Sorenson in support of the Embassy's application for an injunction contains a dollar figure estimate of the precise amount of loss in income for each of the hotels in question. Embassy's own evidence therefore contradicted its claim that money damages would be inadequate to compensate its loss.[5]

## V

### *Conclusion*

The court's order granting the equitable remedy of an injunction to compel continued performance of the management contracts was error as a matter of law. The relationship was one of agency and the principal always retains the unrestricted power to revoke the agent's authority. The injunction impermissibly calls for specific enforcement of personal service contracts. Finally, Embassy did not demonstrate that a damage award was not an adequate remedy for plaintiffs' alleged wrongful termination.

### DISPOSITION

The order granting the preliminary injunction is reversed with directions to enter a new order denying Embassy's application.

Kline, P. J., and Peterson, J., concurred.

---

[5] Sorenson also declares on information and belief that plaintiffs are "in severe financial difficulties and would be unable to respond to a judgment in favor of Embassy" and that plaintiffs' desire to terminate the contracts is merely an attempt to maximize short term cash flow and reduce expenses. These charges not only constituted inadmissible speculation, but were denied in Woolley's counter-declaration.